**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

LONG BRANCH FARMS LLC, individually and on behalf of all others similarly situated,

Plaintiff,

v.

KOCH AG & ENERGY SOLUTIONS, LLC, KOCH FERTILIZER, LLC, KOCH AGRONOMIC SERVICES, LLC, NUTRIEN LTD., NUTRIEN AG SOLUTIONS, INC., THE MOSAIC CO., MOSAIC FERTILIZER, LLC, CF INDUSTRIES HOLDINGS, INC., CF INDUSTRIES, INC., CF NITROGEN, LLC, YARA INTERNATIONAL ASA, YARA NORTH AMERICA, INC., AND CANPOTEX LIMITED,

Defendants.

Case No. 2:26-cv-2188

**JURY TRIAL DEMANDED**

**<u>CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS


I. INTRODUCTION ....................1

II. JURISDICTION AND VENUE ....................2

III. PARTIES ....................3

A. Plaintiff ....................3

B. Defendants ....................3

1. Koch ....................3

2. Nutrien ....................5

3. Mosaic ....................6

4. CF Industries ....................6

5. Yara ....................7

6. Canpotex Limited ....................8

C. Co-Conspirators and Other Non-Parties ....................8

IV. FACTUAL ALLEGATIONS ....................9

A. Background on NPK Fertilizers ....................9

1. Nitrogen Fertilizers ....................11

2. Phosphorus Fertilizers ....................12

3. Potash Fertilizers ....................12

B. Defendants Raised NPK Fertilizer Prices in Parallel During the Class Period and Maintained Prices at Supracompetitive Levels ....................14

1. Nitrogen Fertilizers ....................16

2. Phosphorus Fertilizers ....................18

3. Potash Fertilizers ....................19

C. Variations in Input Cost and Supply Do Not Account for NPK Fertilizer Prices During the Class Period ....................20

1. Increased Input Costs Do Not Account for the NPK Fertilizer Price Increases During the Class Period ....................20

2. Supply Disruptions Do Not Account for the NPK Fertilizer Price Increases During the Class Period ....................23

D. The Structure and Characteristics of the Market for NPK Fertilizers Support the Existence of an Anticompetitive Conspiracy ....................25

1. The NPK Fertilizer Market is Highly Concentrated ....................26

2. The NPK Fertilizer Market Has High Barriers to Entry ....................28

3. Supply-Side Concentration ....................28

4. Unconcentrated Demand Side ....................29

5. NPK Fertilizers are Standardized ....................30

6. The NPK Fertilizer Market is Characterized by Inelastic Demand ....................30

7. Defendants Have Ample Opportunity to Collude ....................30

8. Federal Scrutiny and Investigation into Price Collusion in the NPK Fertilizer Industry ....................37

9. The NPK Fertilizer Industry Has Drawn Antitrust Scrutiny for Decades ....................40

V. ANTITRUST INJURY ....................41

VI. RELEVANT ANTITRUST MARKET ....................42

A. The Relevant Product Market is NPK Fertilizers ....................42

B. The Relevant Geographic Market is the United States ....................42

VII. INTERSTATE COMMERCE ....................42

VIII. TOLLING OF THE STATUTE OF LIMITATIONS ....................43

IX. CLASS ACTION ALLEGATIONS ....................44

X. CLAIMS FOR RELIEF ....................48

XI. DEMAND FOR RELIEF ....................50

XII. DEMAND FOR JURY TRIAL ....................51

Plaintiff Long Branch Farms LLC ("Plaintiff") brings this class action against Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, Koch Agronomic Services, LLC, Nutrien Ltd., Nutrien Ag Solutions, Inc., The Mosaic Co., Mosaic Fertilizer, LLC, CF Industries Holdings, Inc., CF Industries, Inc., CF Nitrogen, LLC, Yara International, ASA, Yara North America, Inc., and Canpotex Limited (collectively, the "Defendants"), individually and on behalf of the Class (defined below).[1]

## I. INTRODUCTION

1. This action arises from a *per se* unlawful agreement between Defendants—direct competitors and the largest producers, manufacturers, and sellers of fertilizers in the United States—to artificially increase and fix the prices of, and to restrict the supply of, nitrogen, phosphorus, and potassium (potash) fertilizers (collectively, "NPK Fertilizers") during the Class Period.

2. Defendants' conspiracy enabled NPK Fertilizer prices to peak to all-time highs in 2021, with Defendants leveraging global disruptions to artificially inflate NPK Fertilizer Prices. At the same time that purchasers including Plaintiff and the Class were shouldering these inflated, increased costs for NPK Fertilizers, Defendants enjoyed soaring profits. And even after any global supply disruptions have subsided, Defendants continue to maintain NPK Fertilizer prices at supracompetitive levels.

3. Defendants' conspiracy has attracted the attention of both Congress and federal law enforcement. On March 4, 2026, *Bloomberg* reported that the U.S. Department of Justice ("DOJ")

---

[1] The allegations herein are based on personal knowledge as to Plaintiff's own conduct, and are made on information and belief as to all other matters, based on an investigation by counsel, which included a review of documents created and distributed by Defendants and other publicly available commentary, analysis, and information. Upon information and belief, Plaintiff submits that discovery will further support the allegations in this Class Action Complaint ("Complaint").

Antitrust Division, had opened an investigation into whether NPK Fertilizer producers—including Mosaic, Nutrien, CF Industries, Koch, and Yara—colluded to raise prices in violation of federal antitrust laws.

4. As a direct result of Defendants' conspiracy, and as alleged in more detail below, Plaintiff and members of the Class purchased NPK Fertilizers at artificially inflated prices and were thereby injured in their business or property.

5. Plaintiff seeks to represent a Class of persons and entities that purchased NPK Fertilizers directly from Defendants at supracompetitive prices to recover treble damages, injunctive relief, and other relief as is appropriate, based on Defendants' violation of federal antitrust laws. Plaintiff demands a trial by jury.

## II. JURISDICTION AND VENUE

6. Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26). The Court has jurisdiction over Plaintiff's claims for injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26).

8. The Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because (a) there are more than 100 members of the Class; (b) citizenship of at least one proposed Class member is different from that of any Defendant; and (c) the matter in

controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000, exclusive of interest and costs.

9. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

10. This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States and its territories, including in this District; (b) participated in the sale and distribution of NPK Fertilizers throughout the United States and its territories, including in this District; (c) had substantial contacts with the United States and its territories, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States and its territories, including in this District.

## III. PARTIES

### A. Plaintiff

11. Plaintiff Long Branch Farms LLC is an Arkansas limited liability company located in Moro, Arkansas. Plaintiff purchased NPK Fertilizers directly from Nutrien during the Class Period (defined below) and paid unlawfully inflated prices for those NPK Fertilizers as a result of Defendants' illegal conduct described herein. Plaintiff intends to purchase NPK Fertilizers in the future.

### B. Defendants

#### 1. Koch

12. Defendant Koch Ag & Energy Solutions, LLC ("KAES") is a Delaware limited liability company headquartered in Wichita, Kansas. KAES "is a global provider of value-added

solutions for the agriculture, energy and chemical markets" that produces fertilizer and nutrient enhancement products.[2] During the Class Period, KAES manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

13. Koch Fertilizer, LLC ("Koch Fertilizer") is a Delaware limited liability company headquartered in Wichita, Kansas. Koch Fertilizer is a wholly owned subsidiary of KAES. Koch Fertilizer and its affiliates are collectively one of the world's largest producers and marketers of fertilizers, including ammonia, urea, urea ammonium nitrate, phosphate, potash, and sulfur-based products.[3] Koch Fertilizer manufactures, markets, and distributes more than 12 million metric tons of fertilizer products annually.[4] During the Class Period, Koch Fertilizer manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

14. Koch Agronomic Services, LLC ("KAS") is a Delaware limited liability company headquartered in Wichita, Kansas. KAS is a wholly owned subsidiary of KAES. KAS "deliver[s] trusted crop nutrient solutions."[5] During the Class Period, KAS manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

---

[2] *Koch Ag & Energy Solutions*, Koch AG & Energy Solutions, https://kochagenergy.com/ (last visited Mar. 26, 2026).

[3] *Companies: Koch Fertilizer*, Koch AG & Energy Solutions, https://kochagenergy.com/companies (last visited Mar. 26, 2026).

[4] *Quality Products. Proven Results*, Koch Fertilizer, https://kochfertilizer.com/products (last visited Mar. 26, 2026).

[5] *Global Leader In Plant Nutrient Solutions*, Koch Agronomic Service, https://kochagronomicservices.com/ (last visited Mar. 26, 2026).

15. KAES, Koch Fertilizer, and KAS are collectively referred to throughout the Complaint as "Koch."

**2. Nutrien**

16. Nutrien Ltd. is Canadian company headquartered in Saskatchewan, Canada. Nutrien Ltd. is "the largest upstream fertilizer producer globally, with extensive midstream distribution capabilities."[6] Nutrien Ltd. boasts that with its "advantaged position across the ag value chain, [Nutrien Ltd.] can anticipate trends, respond faster and more effectively produce and distribute the products and services that farmers need."[7] During the Class Period, Nutrien Ltd. manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

17. Nutrien Ag Solutions, Inc. ("NAS") is Delaware corporation headquartered in Loveland, Colorado. NAS is the retail division of, and a wholly owned subsidiary of, Nutrien Ltd. NAS is one of the largest manufacturers and distributors of NPK Fertilizers in the United States. During the Class Period, NAS manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

18. Nutrien Ltd. and NAS are collectively referred to throughout the Complaint as "Nutrien."

---

[6] *Our Business*, Nutrien, https://www.nutrien.com/about/our-business (last visited Mar. 26, 2026).

[7] *Id*.

**3. Mosaic**

19. The Mosaic Company ("Mosaic Company") is a Delaware corporation headquartered in Tampa, Florida. Mosaic Company is the world's leading integrated producer of concentrated phosphate and potash nutrients for use in NPK Fertilizers.[8] During the Class Period, Mosaic Company manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

20. Defendant Mosaic Fertilizer, LLC ("Mosaic Fertilizer") is a Delaware limited liability company headquartered in Minnetonka, Minnesota. Mosaic Fertilizer is a subsidiary of Mosaic Company that produces fertilizer. During the Class Period, Mosaic Fertilizer manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

21. Mosaic Company and Mosaic Fertilizer are collectively referred to throughout the Complaint as "Mosaic."

**4. CF Industries**

22. CF Industries Holdings, Inc. ("CF Industries Holdings") is a Delaware corporation headquartered in Northbrook, Illinois. CF Industries produces nitrogen-based NPK Fertilizers for sale throughout the United States and the United Kingdom. During the Class Period, CF Industries Holdings manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

---

[8] *Our Mission*, Mosaic, https://mosaicco.com/About. (last visited Mar. 26, 2026)

23. CF Industries Inc. is a Delaware corporation headquartered in Northbrook, Illinois. CF Industries Inc. is a wholly-owned subsidiary of CF Industries Holdings. CF Industries Inc. is the primary operating subsidiary of CF Industries Holdings. According to CF Industries Inc., it is a "leading global manufacturer of hydrogen and nitrogen products for . . . fertilizer[.]"[9] During the Class Period, CF Industries Inc. manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

24. CF Nitrogen, LLC ("CF Nitrogen") is a Delaware corporation headquartered in Northbrook, Illinois. During the Class Period, CF Nitrogen manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

25. CF Industries Holdings, CF Industries Inc., and CF Nitrogen are collectively referred to throughout the Complaint as "CF Industries."

**5. Yara**

26. Yara International ASA ("Yara International") is a Norwegian company headquartered in Oslo, Norway. Yara International is a leading producer of fertilizers, including NPK Fertilizers, which it markets and distributes globally. During the Class Period, Yara International manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

27. Yara North America, Inc. ("Yara North America") is a Delaware corporation headquartered in Tampa, Florida. Yara North America is a wholly owned subsidiary of Yara

---

[9] CF Industries, Inc., https://www.cfindustries.com/ (last visited Mar. 26, 2026).

International. Yara North America's main business activities are sales, marketing, or distribution. Yara North America markets a comprehensive offering of crop nutrition services, including a portfolio of NPK Fertilizers.[10] During the Class Period, Yara North America manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

28. Yara International and Yara North America are collectively referred to throughout the Complaint as "Yara."

#### 6. Canpotex Limited

29. Canpotex Limited ("Canpotex") is a private jointly owned export company, equally owned by Nutrien and Mosaic Canada Corp Nutrition, LP (a wholly owned subsidiary of Mosaic Company) that is headquartered in Saskatchewan, Canada.[11]

### C. Co-Conspirators and Other Non-Parties

30. Various other persons, firms, and corporations not named as Defendants may have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

31. The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of

---

[10] *Fertilizer Products*, Yara North America, https://www.yara.us/crop-nutrition/fertilizer-products/ (last visited Mar. 26, 2026).

[11] *About Us*, Canpotex, https://www.canpotex.com/who-we-are/about-us/ (last visited Mar. 26, 2026).

Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

32. Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

33. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

34. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

35. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiff is alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Furthermore, to the extent that subsidiaries within corporate families distributed the NPK Fertilizers discussed in this Complaint, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut their pricing agreements. Thus, all Defendant entities within the corporate families were active, knowing, participants in the conspiracy to maintain supracompetitive prices.

## IV. <u>FACTUAL ALLEGATIONS</u>

### A. Background on NPK Fertilizers

36. Along with seeds and pesticides, fertilizer is a critical input for agriculture producers and enables high-yield crop production. Fertilizer demand in the United States is driven

mainly by the intensive cultivation of crops like corn, soybeans and wheat. Fertilizer provides the essential nutrients that plants need for healthy growth, with the primary crop nutrients being nitrogen (N), phosphorus (P), and potassium (K). Together, these nutrients are referred to as "NPK."

37. NPK Fertilizers are applied depending on crop and soil requirements, as single nutrient products or blended in set proportions. These blends are typically labeled with three numbers indicating the percentage of each nutrient in the product.

38. Nitrogen fertilizer consumption volume is typically more than double the consumption volume of phosphate and potassium. As reported by the U.S. Department of Agriculture, from 2006 to 2023, nitrogen fertilizer consistently made up the largest share of fertilizer consumption by volume, at 59%. Potassium, referred to as potash fertilizer, made up 22% of fertilizer consumption by volume, and phosphate fertilizer comprised the remaining 19%.[12]

[12] *U.S. fertilizer consumption rebounds from 2021 drop*, USDA Economic Research Service (Sep. 24, 2025), https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=113348.




39. Potash and phosphorus fertilizers are produced from mined ores, while nitrogen fertilizers are the product of a complex, energy intensive process.

**1. Nitrogen Fertilizers**

40. Nitrogen (N) is one of the most widely distributed elements in nature and is an abundant gas in the atmosphere. Nitrogen is a primary building block for all organisms. It is essential to making proteins, helps keep plants green and is a critical component of soil structure.

41. Nitrogen fertilizers are synthesized using an industrial process known as the Haber-Bosch process. This process consists of a reaction between atmospheric nitrogen and hydrogen, most commonly sourced from natural gas (methane). The nitrogen and hydrogen are combined under conditions of intense heat and pressure to form ammonia gas, which is then condensed by

cooling to create liquid ammonia or anhydrous ammonia, which is a foundational input for nitrogen fertilizers. There are no viable alternative methods for ammonia production.

42. In addition to anhydrous ammonia, which can be injected into the soil, nitrogen fertilizers can take several forms, such as urea, ammonium nitrate and ammonium sulfate. Each form contains different percentages of nitrogen content and are produced by combining ammonia with other ingredients.

43. Urea, a common nitrogen fertilizer with 46% nitrogen content, is produced by combining ammonia and carbon dioxide and is sold as solid white crystalline fertilizer pellets. Ammonium nitrate, which contains 34% nitrogen content, is derived from ammonia and nitric acid, while ammonium sulfate, which contains 21% nitrogen content, is derived from ammonia and sulfuric acid. Urea and ammonium nitrate may also be blended together to produce urea-ammonium nitrate, or UAN, which is a liquid solution containing 28-32% nitrogen.

**2. Phosphorus Fertilizers**

44. Phosphorus (P), found in every living cell, is a component of DNA. Phosphorus plays a vital role in capturing light during photosynthesis, helping with seed germination, and helping plants use water efficiently. Plants also use phosphorus to help fight external stress and prevent disease.

45. Phosphorus fertilizers are produced from phosphate rock. The phosphate rock is mined and treated with sulfuric acid to generate phosphoric acid. The phosphoric acid is then combined with ammonia to be more easily absorbed by plants. Monoammonium phosphate and diammonium phosphate are two such phosphorus fertilizers.

**3. Potash Fertilizers**

46. Potassium (K) is essential to the workings of every living cell. It plays an important role in a plant's water utilization, and it helps regulate the rate of photosynthesis. Other aspects of

plant health influenced by potassium include the growth of strong stalks, protection from extreme temperatures, and the ability to fight stress and pests such as weeds and insects.

47. Potassium fertilizers are sourced from potash, which is mined from underground by injecting hot water deep into the ground to dissolve mineral deposits containing potassium chloride, among other things. The mined potassium chloride is combined with sulfuric acid and water to produce potassium sulfate fertilizer, with 50% potassium content. Other companion nutrients may also be used.

48. The below graphic identifies the production processes for NPK Fertilizers.[13]




[13] , *Drivers of Fertilizer Markets: Supply, Demand, and Price*, USDA Economic Research Service (Sep. 2025), https://ers.usda.gov/sites/default/files/_laserfiche/publications/113324/ERR-354.pdf ?v=89250.

**B. Defendants Raised NPK Fertilizer Prices in Parallel During the Class Period and Maintained Prices at Supracompetitive Levels**

49. Defendants exercise significant market power in the NPK Fertilizer market. Because Defendants have substantial capacity advantages over competitors, Defendants materially influence the prices in the NPK Fertilizer market.

50. Beginning in 2021, NPK Fertilizer pricing broke from previous patterns, and NPK Fertilizer prices sharply increased to record levels. This price surge reflects the Defendants' collusive conduct.

51. In 2021, the wholesale fertilizer index increased by over 60% when compared to 2020, with nitrogen levels jumping 95% and potash rising over 70%. In 2022, wholesale fertilizer prices rose dramatically higher, averaging 132% higher than 2020 prices:




52. Once Defendants began sharply raising NPK Fertilizer prices in 2021, they continued to sustain prices above competitive rates through the present day. After decreasing prices in 2023, Defendants resumed price hikes beginning in 2024.

53. As a result of Defendants' collusive conduct, Defendants sold NPK Fertilizers at supracompetitive prices throughout the Class Period and continue to sell NPK Fertilizers at supracompetitive prices today.

54. This pricing pattern – with a steep price increase in 2021 to 2022, decreases in 2023, and resumed increases from 2024 onward, are consistent across NPK Fertilizer types:

**Nitrogen Fertilizer Producer Price Index for 2016 – 2026**




**Phosphorus Fertilizer Producer Price Index for 2016 - 2026**



**Potash Fertilizer Producer Price Index for 2016 – 2022[14]**




55. Nitrogen, phosphorus, and potash fertilizers involve different chemical products, different production processes, different raw material inputs, and often different producers. In a competitive market, one would expect the prices of these distinct products to be driven by their respective cost structures and supply-demand fundamentals, producing differentiated price trajectories. That the prices of nitrogen, phosphorus, and potash fertilizers followed the same pattern during the Class Period—steep price increases in 2021 to 2022, decreases in 2023, and resumed increases from 2024 onward—is consistent with coordinated conduct among Defendants.

56. Moreover, Defendants engage in a pattern of parallel pricing—following each other's pricing in terms of amount, percentage change, and timing.

**1. Nitrogen Fertilizers**

57. From 2021 to 2022, Nutrien's nitrogen fertilizer prices soared: its ammonia prices increased from an average of $477 per metric ton in 2021 to an average of $973 per metric ton in 2022, a 104% increase; its urea prices increased from an average of $478 per metric ton to an

[14] Data discontinued after 2022.

average of $696 per metric ton, a 46% increase; and its prices for nitrates and other nitrogen fertilizers increased from an average of $238 per metric ton to an average of $402 per metric ton, a 69% increase.[15]

58. Likewise, CF Industries dramatically raised the prices of its similar nitrogen fertilizer products over the same period: its ammonia prices increased from an average of $498 per metric ton in 2021 to $936 per metric ton in 2022, an 88% increase; its granular urea prices increased from an average of $438 per metric ton to an average of $633 per metric ton, a 45% increase; its UAN solution prices increased from an average of $272 per metric ton to an average of $526 per metric ton, a 93% increase; and its ammonium nitrate prices increased from an average of $297 per metric ton to an average of $530 per metric ton, a 78% increase.[16]

59. Nutrien and CF Industries' parallel pricing of their nitrogen fertilizers from 2021 to 2022 was no anomaly. A review of Nutrien and CF Industries' ammonia pricing from 2017 to 2025 reveals that these Defendants' prices also followed each other closely:




[15] *Nutrien Reports Fourth Quarter and Full-Year 2022 Results*, Nutrien Ltd. (Feb. 15, 2023).

[16] CF Indus. Holdings, Inc., Form 10-K (Feb. 23, 2023).

60. Upon information and belief, Defendants Yara and Koch made similar price increases across their lines of nitrogen fertilizers.

**2. Phosphorus Fertilizers**

61. Defendants also increased the prices of their phosphorus fertilizers in parallel. Nutrien increased its price for phosphate fertilizer in North America from an average of $602 per metric ton in 2021 to an average of $806 per metric ton in 2022, a 34% increase.[17]

62. Mosaic's average price for phosphate fertilizer in North America also increased substantially over the same period, from an average of $564 per metric ton in 2021 to an average of $804 per metric ton in 2022, a 43% increase.[18]

63. While Defendants' phosphorus fertilizer prices began declining in 2023, the price decreases did not last. By 2025, Nutrien and Mosaic resumed significant price increases. Nutrien's price for phosphate fertilizer in North American increased from an average of $615 per metric ton in the fourth quarter of 2024 to an average of $677 per metric ton in the fourth quarter of 2025, a 10% increase.[19] Mosaic's price for phosphate fertilizer in North America increased from an average of $593 per metric ton in the fourth quarter of 2024 to an average of $686 per metric ton in the fourth quarter 2025, a 16% increase.[20]

---

[17] *Nutrien Reports Fourth Quarter and Full-Year 2022 Results*, Nutrien Ltd. (Feb. 15, 2023).

[18] *Q4 Non Gaap Financial Measures for Additional Information and 2022*, Mosaic Co. (Feb. 22, 2023).

[19] *Nutrien Reports Full-Year 2025 Results and Provides 2026 Guidance*, Nutrien Ltd. (Feb. 18, 2026).

[20] *The Mosaic Company Reports Fourth Quarter and Full Year 2025 Results*, Mosaic Co. (Feb. 24, 2026).

### 3. Potash Fertilizers

64. Defendants also increased the prices of their potash fertilizers in parallel. Nutrien increased its price for potash fertilizers in North America from an average of $317 per metric ton in 2021 to an average of $667 per metric ton in 2022, a 110% increase.[21]

65. Mosaic's average price for potash fertilizer in North America also increased substantially over the same period, from an average of $285 per metric ton in 2021 to an average of $632 per metric ton in 2022, a 122% increase.[22]

66. While Defendants' potash prices began declining in 2023, the price decreases did not last. In 2025, Defendants Nutrien and Mosaic once again raised prices to similar levels. Nutrien raised the prices of its potash in North America from an average of $270 per metric ton in the fourth quarter of 2024 to an average of $305 per metric ton in the fourth quarter of 225, a 13% increase.[23] Similarly, Mosaic raised the prices of its potash in North America from an average of $199 per metric ton in the fourth quarter of 2024 to an average of $264 per metric ton in the fourth quarter of 2025, a 33% increase.[24]

67. The renewed and concurrent rise in prices across NPL Fertilizers beginning in 2024 and continuing through 2026—following the temporary moderation observed in 2023—mirrors the same coordinated pricing pattern that characterized the 2021–2022 period.

---

[21] *Nutrien Reports Fourth Quarter and Full-Year 2022 Results*, Nutrien Ltd. (Feb. 15, 2023).

[22] *Q4 Non Gaap Financial Measures for Additional Information and 2022*, Mosaic Co. (Feb. 22, 2023).

[23] *Nutrien Reports Full-Year 2025 Results and Provides 2026 Guidance*, Nutrien Ltd. (Feb. 18, 2026).

[24] *The Mosaic Company Reports Fourth Quarter and Full Year 2025 Results*, Mosaic Co. (Feb. 24, 2026).

68. Defendants' pattern of recurring, synchronized price movements across three chemically distinct product categories is more consistent with coordinated conduct than with independent pricing decisions made by firms responding to independent cost structures and supply-demand conditions.

### C. Variations in Input Cost and Supply Do Not Account for NPK Fertilizer Prices During the Class Period

69. In a competitive market, the price of any good reflects the balance between production costs and consumer demand. No rational manufacturer would independently raise prices above competitive levels, as buyers would simply shift their purchases to lower-cost alternatives. Accordingly, an abrupt or otherwise unexplained price movement signals one of two possibilities: a material disruption to supply or demand conditions, or a breakdown in the competitive dynamics among market participants.

70. External cost shocks can serve as a facilitating mechanism for coordinated pricing behavior. Competing firms may exploit such disruptions to collectively anchor prices at supracompetitive levels—either by raising prices beyond what the shock economically justifies, or by sustaining elevated prices through continued coordination even after underlying costs have normalized.

71. Accordingly, the operative question in assessing whether the NPK Fertilizer prices reflect anticompetitive coordination is not simply whether an external market disruption occurred, but whether such a disruption sufficiently accounts for both the magnitude of the initial price increases and the persistence of elevated prices thereafter. On the facts presented here, it does not.

#### 1. Increased Input Costs Do Not Account for the NPK Fertilizer Price Increases During the Class Period

72. From approximately 2021 through 2023, the price for natural gas increased. Natural gas is a key input for nitrogen fertilizer production.

73. Defendants' own public statements reveal that they hedge against input cost shocks. As CF Industries explains in its 2024 Annual Report:

> From time to time, we utilize natural gas derivatives to hedge our financial exposure to the price volatility of natural gas, the principal raw material we use in the production of nitrogen-based products. We may use natural gas futures, swaps and option contracts traded in over-the-counter markets or on exchanges. In addition, from time to time, we may use fixed-price, physical purchase and sales contracts to hedge our exposure to natural gas price volatility.[25]

74. At times, these derivatives cover most of Defendants' natural gas costs. For example, in the first quarter of 2024, CF Industries relied on derivatives to cover about 55% of its natural gas consumption.[26]

75. In fact, Yara International directly admitted that rising natural gas costs had only "[l]imited impact on finished fertilizer production to date" when it reported its financial results for the third quarter of 2021.[27]

76. Indeed, prices across all three types of NPK Fertilizer "remain[ed] stubbornly high" throughout the Class Period, "even as commodity markets soften[ed]."[28]

77. Although rising natural gas costs may have prompted some increase in the price of NPK Fertilizers even in the absence of collusive conduct, under such circumstances, one would expect Defendants' profit margins to decrease during the period of reduced natural gas supply. The publicly available data shows the opposite—while natural gas prices were elevated from 2021 to

[25] CF Industries, 2024 Annual Report, https://s203.q4cdn.com/145805377/files/doc_financials/2024/ar/CF-Industries-2024-Annual-Report.pdf (last visited Mar. 26, 2026).

[26] CF Industries, Form 10-Q (May 2, 2024).

[27] *Yara International ASA 2021 Third quarter results*, Yara Int'l https://www.yara.com/siteassets/investors/057-reports-and-presentations/quarterly-reports/2021/3q-2021/yara-3q-2021-presentation.pdf/ (last visited Mar. 26, 2026).

[28] *Sticky input prices and short supplies: What's keeping fertilizer costs high?*, RealAgriculture (Aug. 28, 2025), https://www.realagriculture.com/2025/08/sticky-input-prices-and-short-supplies-whats-keeping-fertilizer-costs-high/.

2023, the Defendants' profit margins increased precipitously. Defendants' rising profit margins throughout the Class Period demonstrate that their rising NPK Fertilizer prices cannot be explained by their input costs or by other macroeconomic factors.

78. For example, Nutrien reported a 51% increase in its cost of goods for nitrogen fertilizer production in the third quarter of 2021, simultaneously reporting a 680% increase in its gross manufacturing margin during the same period.[29]

79. Similarly, CF Industries was able to increase its profit margins on ammonia and urea even as natural gas costs rose, and to sustain increased margins even after natural gas prices declined:




[29] *Nutrien Delivers Record Third Quarter Results and Raises Full-Year Guidance*, Nutrien, (Nov. 1, 2021), https://cdn.sanity.io/files/ixv7nalm/production/3956fc7a1ca0343615654bbae02a2da0fbd933d5.pdf.

80. Although natural gas prices peaked in 2022, Defendants were able to increase their profit margins across the NPK Fertilizer market, with Mosaic improving on its 2021 profits by 120%, Nutrien by 142%, and CF Industries by 212% in 2022.[30]

81. These precipitous increases in profitability even in the face of skyrocketing input costs suggest that Defendants colluded to raise the prices of NPK Fertilizers under the guise of responding to rising input costs.

**2. Supply Disruptions Do Not Account for the NPK Fertilizer Price Increases During the Class Period**

82. Defendants have attributed their increases to NPK Fertilizer prices during the Class Period to global supply disruptions, including but not limited to the war in Ukraine and sanctions on exports from Russia and Belarus.[31]

83. While Russia's invasion of Ukraine in February 2022 and the ensuing war may have led to some increase in the cost of NPK Fertilizers due to lessened supply of NPK Fertilizer inputs, NPK Fertilizer prices had already begun to rise at rates that drew antitrust scrutiny before the war.

[30] *The cost of growth: Fertilizer companies cash in while farmers and communities struggle*, Noah Zahn, Columbia Missourian (June 8, 2023), https://www.columbiamissourian.com/priceofplenty/profit/the-cost-of-growth-fertilizer-companies-cash-in-while-farmers-and-communities-struggle/article_1d46d1a2-f41c-11ed-b52d-a34f8055089d.html.

[31] *See, e.g.*, *Q1 2022 Earnings Call*, Mosaic Co., (May 3, 2022) ("In potash, sanctions against Belarus and uncertainty over Russian exports are having an impact on supply. Global prices have pushed higher as buyers look to secure adequate volumes.")

84. Two months before the war in Ukraine, on December 8, 2021, the Family Farm Action Alliance sent a letter to the DOJ Antitrust Division calling for the DOJ to investigate the "alarming spike in prices charged to farmers by highly-concentrated fertilizer corporations."[32]

85. That same month, U.S. Senator Chuck Grassley called for Attorney General Merrick Garland to investigate the fertilizer industry for "possible anti-competitive activity and market manipulation," citing steeply rising NPK Fertilizer prices.[33]

86. While Defendants were already drawing antitrust scrutiny before the 2022 invasion of Ukraine, the war did lead the U.S. to impose sanctions on Russia and Belarus, who account for 15% of U.S. potash exports.[34]

87. These sanctions created incentive for producers outside the sanctioned countries to increase potash supply in order to gain market share. If such a production increase occurred in non-sanctioned countries, one would expect potash fertilizer prices to recede back to pre-2022 levels.

88. Moreover, Defendants did not need to look to external suppliers—they had ample potash production capacity themselves. Nutrien boasted that it "responded to extremely tight global market fundamentals" by "safely and efficiently increasing our production by nearly 1

[32] Letter to Assistant Attorney General Jonathan Kanter, Family Farm Action Alliance (Dec. 8, 2021), https://farmaction.us/wp-content/uploads/2021/12/FFAA_DOJ_Fertilizer_Investigation_Final.pdf.

[33] Letter to Attorney General Merrick Garland, Senator Charles E. Grassley (Dec. 15, 2021), https://www.grassley.senate.gov/imo/media/doc/grassley_to_justice_dept.fertilizer.pdf.

[34] *Tariff Threats and US Fertilizer Imports*, Nick Paulson et al., Weekly Farm Economics (Feb. 4, 2025), https://farmdocdaily.illinois.edu/2025/02/tariff-threats-and-us-fertilizer-imports.html.

million tonnes [of potash]," and claiming that doing so "represented a small portion of [its] low-cost available production capacity."[35]

89. Despite Defendants' own ample potash production capacity and the incentives for external suppliers to increase production, both of which should have mitigated major price impacts from sanctions on Russia and Belarus, Defendants have maintained potash fertilizer prices at supracompetitive levels.

90. These inflated prices persist even as Mosaic acknowledged in February 2022 that the global potash supply was "adequate to meet supply in the near term" and even curtailed some of its own potash production capacity.[36]

91. Defendants' maintenance of inflated potash fertilizer prices even with ample potash supply constitutes action against their economic self-interest and suggests that Defendants are colluding to increase/stabilize prices and/or limit potash production.

### D. The Structure and Characteristics of the Market for NPK Fertilizers Support the Existence of an Anticompetitive Conspiracy

92. Structural characteristics of a given market are relevant to determining whether anticompetitive coordination in violation of the antitrust laws has taken place. Certain market structures are materially more susceptible to cartelization than others. Accordingly, evidence of collusion carries greater inferential weight when the prevailing conditions in the relevant market are independently conducive to coordinated behavior.

93. The NPK Fertilizer industry exhibits numerous structural characteristics that render it particularly vulnerable to cartel formation—whether with respect to individual nutrient markets

---

[35] Nutrien, 2021 Annual Report, https://cdn.sanity.io/files/ixv7nalm/production/eab8f308cd5ed5a14587fba8a19f70c516458f08.pdf (last visited Mar. 26, 2026).

[36] *Q4 2023 Earnings Call*, Mosaic Co. (Feb. 22, 2024).

or the market for all three nutrients collectively. Among the relevant factors are: substantial barriers to entry, a highly concentrated supplier base, unconcentrated demand, commodity-like standardization, inelastic purchaser demand, opportunities for overt and covert coordination among competitors, and a history of antitrust scrutiny.

**1. The NPK Fertilizer Market is Highly Concentrated**

94. Over the last 30+ years, the number of companies that produce NPK Fertilizers have sharply declined.[37]




95. Presently, and throughout the Class Period, Mosaic, CF Industries, Nutrien, Koch and Yara have dominated NPK Fertilizer production in the United States.

96. In 2019, four producers accounted for approximately 75% of the nitrogen fertilizer production in the United States – CF Industries, Nutrien, Koch and Yara.[38] This concentration has

[37] *Fertilizer: The Hidden Engine of Corporate Power*, Farm Action (Oct. 9, 2025), https://farmaction.us/fertilizer-the-hidden-engine-of-corporate-power/.

[38] *Concentration and Competition in the U.S. Fertilizer Industry*, Texas A&M University Agricultural and Food Policy Center (March 2024).

only increased, with the top four firms controlling more than 80% of domestic nitrogen fertilizer production.[39]

97. Even fewer producers have significant shares of domestic potash and phosphorus fertilizer production. Nutrien and Mosaic account for more than 90% of potash fertilizer produced in North America, and Mosaic alone produces 80% of the phosphorus fertilizers manufactured in North America and controls 90% of domestic sales.[40]

98. These five firms obtained market dominance through a number of acquisitions and consolidations over the last several decades.

99. For example, in 2010, Yara International acquired U.S.-based fertilizer producer Terra Industries for $4.1 billion, which made Yara the world's largest producer of ammonia and UAN.[41]

100. In 2013, Mosaic – the current dominant player for phosphorus fertilizer – purchased CF Industries' phosphate production, including a Florida phosphate mine, manufacturing plant and other facilities, for $1.2 billion. According to reports, the deal allowed Mosaic, which at the time accounted for more than half of phosphate fertilizer sales in North America, to increase its production of phosphate and allowed CF Industries to focus on its nitrogen fertilizer products.[42]

101. Nutrien, itself, was formed in 2018 through a merger of Potash Corporation of Saskatchewan Inc. and Agrium Inc. Post-merger, Nutrien would be "the world's largest provider

---

[39] *Agriculture Concentration Data*, Farm Action (July 2024) https://farmaction.us/concentrationdata/.

[40] *Id.*

[41] *Yara Buys Terra*, Melody Voith, Chemical & Engineering News (Feb. 22, 2010), https://cen.acs.org/articles/88/i8/Yara-Buys-Terra.html.

[42] *Mosaic to buy CF's phosphate business for $1.2 billion*, Rod Nickel, Reuters (Oct. 28, 2013), https://www.reuters.com/article/world/americas/mosaic-to-buy-cfs-phosphate-business-for-12-billion-idUSBRE99R0QQ/.

of crop inputs and services" and would "produce and distribute over 25 million tonnes of potash, nitrogen and phosphate products world-wide." Nutrien also boasted a "global retail distribution network that includes more than 1,500 farm retail centers."[43]

102. In 2024, Koch purchased the Iowa Fertilizer Co., for $3.6 billion, which notably included its nitrogen fertilizer plant, which produced 3.5 metric tons annually.[44]

**2. The NPK Fertilizer Market Has High Barriers to Entry**

103. Competition is restrained in the NPK Fertilizer market due to extremely high barriers to entry. For example, the production of nitrogen fertilizer requires a manufacturing facility capable of utilizing the Haber-Bosch process. The production of potash and phosphorus fertilizers, meanwhile, require access and means to mine potash and phosphate rock, respectively.

104. NPK Fertilizer production thus requires significant capital investment, including land acquisition, specialized engineering, extensive permitting and years of development. Potential new entrants would also need to displace long-standing customer relationships.

105. There are no economically viable substitutes in the NPK Fertilizer markets in the U.S., which further enhances the Defendants' market power and dominance. At the same time, the core products at issue are relatively homogenous, if not fungible.

**3. Supply-Side Concentration**

106. As discussed above, the NPK Fertilizer market is highly concentrated, with Defendants controlling the vast majority of production. Four firms dominate U.S. production of

---

[43] *Agrium and PotashCorp Merger Completed Forming Nutrien, a Leader in Global Agriculture*, Nutrien, (Jan. 2, 2018), https://www.nutrien.com/news/press-releases/agrium-and-potashcorp-merger-completed-forming-nutrien-a-leader-in-global-agriculture-1551.

[44] *Koch completes controversial $3.6 billion purchase of Iowa Fertilizer Co. plant*, Donnelle Eller, Des Moines Register (Aug. 29, 2024), https://www.desmoinesregister.com/story/money/agriculture/2024/08/29/koch-inc-says-3-billion-purchase-of-iowa-fertilizer-co-plant-finalized/74996475007/.

nitrogen fertilizers - CF Industries, Nutrien, Koch and Yara. Two firms dominate the production of potash fertilizer – Nutrien and Mosaic. And, Mosaic dominates production of phosphorus fertilizers. Given this high concentration, the NPK Fertilizer market is highly susceptible to collusion.

107. A 2024 paper from Texas A&M University's Agricultural and Food Policy Center analyzed market concentration in the U.S. fertilizer industry. Using the Herfindahl–Hirschman Index, which is a commonly accepted measure of market concentration, the paper found "high levels" of concentration for nitrogen, potash and phosphorus fertilizers in the U.S.[45]

**Table 2. Herfindahl-Hirschman Index (HHI) measure for Fertilizers by Geographic Scope**

| Geographic Scope | United States | North America | World |
|---|---|---|---|
| Potash | 3,455 | 4,255 | 1,011 |
| Nitrogen | 2,382 | 2,242 | 368 |
| Phosphate | 4,553 | 4,533 | 152 |

108. When evaluating mergers and acquisitions under the Sherman Act, the DOJ and Federal Trade Commission ("FTC") measure market concentration levels using the Herfindahl–Hirschman Index. Per DOJ and FTC Merger Guidelines, "[m]arkets with an HHI greater than 1,800 are highly concentrated[.]"[46]

109. This level of concentration raises significant competition concerns and is presumptively susceptible to anticompetitive conduct.

**4. Unconcentrated Demand Side**

110. The demand side of the NPK Fertilizer market is unconcentrated, with thousands of purchasers, each of whom forms a small share of the overall market. This unconcentrated

[45] *Concentration and Competition in the U.S. Fertilizer Industry*, Texas A&M University Agricultural and Food Policy Center (March 2024).

[46] *Merger Guidelines*, U.S. Department of Justice (Dec, 18, 2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

demand side, without power sufficient to stimulate competition, makes the NPK Fertilizer market susceptible to collusion. There is little incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing agreement carries large penalties.

**5. NPK Fertilizers are Standardized**

111. NPK Fertilizers are standardized because their nutrients are basic chemical components traded as commodities and used interchangeably, regardless of the specific source. NPK Fertilizers are fungible, homogenous and commodity products with little differentiation, and one supplier's product is readily substituted for another supplier's product. As a result, buyers make purchase decisions based largely, if not entirely, on price.

**6. The NPK Fertilizer Market is Characterized by Inelastic Demand**

112. The NPK Fertilizer market is also highly inelastic, which makes them easily susceptible to cartel and other anticompetitive behavior. When demand is inelastic, increases in price do not meaningfully reduce the quantity purchased, allowing firms engaged in collusion to raise prices without risking significant loss of sales.

113. Demand for NPK Fertilizers is inelastic because these products provide the nutrients necessary to sustain crop production, and farmers must replenish the soil with fertilizers every year, sometimes multiple times throughout the year.

114. Purchasers of NPK Fertilizers, like Plaintiff, are more vulnerable to collusion among Defendants, who are able to raise prices without fearing lost sales or substitution.

**7. Defendants Have Ample Opportunity to Collude**

115. Throughout the Class Period, Defendants had ample opportunity to collude due to the market consolidation described *supra*, their common membership in trade associations, and

interrelated business relationships between certain executives, officers, and employees of the Defendants.

116. Participation in trade associations and other business relationships make a market more susceptible to collusive behavior because they can provide a pretense under which conspirators can exchange sensitive company information, such as pricing and market allocation.

117. Moreover, trade associations and other business relationships provide opportunities for Defendants to share firm-specific competitively sensitive information that would normally remain private, which can create a strong inference of active collusion.

118. Defendants have had multiple opportunities to collude and to share competitively-sensitive information through trade associations and joint ventures.

**a. The International Fertilizer Association**

119. Defendants Canpotex, CF Industries, Koch Agronomic Services, The Mosaic Company, Nutrien Ag Solutions, and Yara are all active members of the International Fertilizer Association ("IFA"),[47] a global fertilizer association headquartered in Paris, France.[48] IFA's members include organizations at all levels of the fertilizer supply chain: fertilizer producers, traders and distributors, as well as their associations, service providers to the industry, research organizations, agtech start-ups and non-governmental organizations.

120. Several of Defendants' highest-ranking officers serve on IFA's board: Kenneth Seitz (President and Chief Executive Officer of Nutrien) is IFA's Chair and a member of its Executive Committee, and Chris Bohn (President and Chief Executive Officer of CF Industries),

---

[47] *Our Members*, IFA, https://www.fertilizer.org/about-ifa/our-members/ (last visited Mar. 26, 2026).

[48] *Contact Us*, IFA, https://www.fertilizer.org/about-ifa/contact-us/ (last visited Mar. 26, 2026).

Bruce Bodine (President and Chief Executive Officer of Mosaic), and Svein Tore Holsether (President and Chief Executive Officer of Yara International, are also members of IFA's Board.[49]

121. IFA sponsors a number of recurring in-person trade events that it claims "facilitate the sharing of information and best practices."[50] During the Class Period, IFA sponsored a number of in-person trade events including:

> 2021 Annual Conference—September 27-29, 2021, Lisbon, Portugal;
>
> 2022 Annual Conference—May 30-June 1, 2022, Vienna, Austria;
>
> 2022 Asia Pacific Crossroads—October 5-7, 2022, Singapore;
>
> 2022 Strategic Forum— October 31-November 2, 2022, Washington, D.C.;
>
> 2023 Annual Conference—May 22-24, 2023, Prague, Czech Republic;
>
> 2023 Global Markets Conference—July 11-12, 2023, London, UK;
>
> 2023 IFA Crossroads—October 10-12, 2023, Bangkok, Thailand;
>
> 2023 IFA Strategic Forum—November 28-30, 2023, Doha, Qatar;
>
> 2024 Global Sustainability Conference—March 6-8, 2024, Amsterdam, Netherlands;
>
> 2024 Annual Conference— May 20-22, 2024, Singapore;
>
> 2024 Global Markets Conference—July 9-11, 2024, London, UK;
>
> 2024 IFA Crossroads—October 8-10, 2024, Hong Kong, China;
>
> 2024 IFA Strategic Forum—November 19-21, 2024, Madrid, Spain;
>
> 2025 Cultivating Tomorrow—April 1-3, 2025, Barcelona, Spain;
>
> 2025 IFA Annual Conference—May 12-14, 2025, Monaco;
>
> 2025 Global Markets Conference—July 1-2, 2025, London, UK;

---

[49] *Our Board*, IFA, https://www.fertilizer.org/about-ifa/structure-governance/our- board/ (last visited Mar. 26, 2026).

[50] *What We Do*, IFA, https://www.fertilizer.org/about-ifa/what-we-do/ (last visited Mar. 26, 2026).

2025 IFA Crossroads—October 7-9, 2025, Bangkok, Thailand; and

2025 IFA Strategic Forum—November 18-20, 2025, Rabat, Morocco.

122. Since June 2018, IFA has overseen a data collection program known as IFSTAT. According to IFA, "IFASTAT is the leading source of fertilizer and raw materials statistics in the world. Compiled by IFA's Market Intelligence team, IFASTAT is a one-stop shop for the most comprehensive statistical information on fertilizers and raw materials supply and fertilizer consumption."[51]

123. IFASTAT provides "detailed statistics about the fertilizer market," including 15 years of global capacity production and trade data along with almost 70 years of plant nutrient consumption data, and reports on medium-term and short-term supply and demand outlooks.[52]

124. The data in IFASTAT is generally organized into two categories: Supply and Consumption. Consumption data is accessible to the public, while supply data is available only to members. Supply data includes "production and trade detailed data from 2002 onwards by product and/or country . . . ." Information is presented to users in database and chart form, along with reports, factsheets, and webinars.[53]

125. Additionally, IFASTAT offers market outlook reports. While IFASTAT providers public access to Market Outlook Summaries, it provides members with detailed medium-term and short-term supply and demand reports, as well as quarterly Fertilizer Market Update reports.[54] Other member-exclusive information on IFASTAT includes webinars, product factsheets,

---

[51] *IFASTAT*, IFA, https://www.fertilizer.org/market-intelligence/ifastat/ (last visited Mar. 26, 2026).

[52] *Join IFA*, IFA, https://www.fertilizer.org/join-ifa/ (last visited Mar. 26, 2026).

[53] *Databases*, IFASTAT, https://www.ifastat.org/databases (last visited Mar. 26, 2026).

[54] *Market Outlooks*, IFASTAT, https://www.ifastat.org/market-outlooks (last visited Mar. 26, 2026).

country-specific supply reports, and country-specific factsheets. The public may view information on a regional level, but not on a product or country level.

**b. The Fertilizer Institute**

126. Defendants also have opportunities to share competitively-sensitive data and collude via their participation in The Fertilizer Institute ("TFI"), a national fertilizer industry organization headquartered in Arlington, Virginia.[55]

127. CF Industries, Inc, Koch Fertilizer, LLC., The Mosaic Company, Nutrien, and Yara North America, Inc., are all members of TFI, and each of these Defendants has executives serving on TFI's board, including Chris Bohn (President and Chief Executive Officer of CF Industries), Scott McGinn (Executive Vice President of Koch Fertilizer), Bruce Bodine (President and Chief Executive Officer of Mosaic), Kenneth Seitz (President and Chief Executive Officer of Nutrien), and Sabine Schröder (President of Yara North America).

128. TFI sponsors a number of trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference.[56]

129. TFI touts itself as "the sole source of the fertilizer industry data you need for your business," and throughout the Class Period, TFI coordinated the exchange of information among Defendants through exclusive "market intelligence data," statistical reports, and surveys.

130. The member-exclusive fertilizer industry data that TFI collects and distributes includes:

a. The Fertilizer RECORD: monthly data (released quarterly) on production, producer

---

[55] *Leadership*, TFI, https://www.tfi.org/about-us/leadership/ (last visited Mar. 26, 2026).

[56] *Event Calendar*, The Fertilizer Institute, https://www.tfi.org/events/event-calendar/ (last visited Mar. 26, 2026).

inventories, and producer disappearance;

b. Fertilizer Imports and Exports: "Monthly fertilizer trade data (quality and value)";

c. Feedgrade Phosphate Report: a monthly report of phosphate sales, which includes historical data back to January 1984;

d. Market Intelligence Resources; and

e. TFI Coverage of USDA's Monthly Agricultural Prices Reports.

131. Additionally, TFI offers Fertilizer Reporting Solutions ("FRS"), which is an "industry-led platform designed to streamline fertilizer tonnage reporting through a single, centralized system." FRS was developed "in partnership with TFI members" and officially launched in 2024.

**c. Additional Trade Associations**

132. Defendants also participate in a number of additional trade associations that provide additional opportunities for collusion. For example, CF Industries, Mosaic, Nutrien, Yara North America, and Koch Fertilizer Canada (a Canadian affiliate of Koch) all have representatives on the board of directors of Fertilizer Canada, a trade association that "represents producers, manufacturers, wholesale and retail distributors of nitrogen, phosphate, potash and sulphur fertilizers."[57] Meanwhile, both Koch and Mosaic are members of the Agricultural Retail Association, an industry trade group based in Arlington, Virginia, and each has a representative on the association's board of directors.[58] Additionally, Defendants have participated in the Fertilizer Industry Round Table ("FIRT"), with representatives of CF Industries and Koch Fertilizer having served on the organization's board of directors.[59] FIRT touts itself as "a forum for industry leaders

---

[57] *About*, Fertilizer Canada, https://fertilizercanada.ca/about/ (last visited Mar. 26, 2026).

[58] *ARA Board of Directors*, Agricultural Retailers Association, https://www.aradc.org/board (last visited Mar. 26, 2026).

[59] *Current Board*, FIRT, http://www.firt.org/about/current-board (last visited Mar. 26, 2026).

from across the supply chain — from soil science to economics to production and distribution — to share best practices, innovative technologies, global market trends, and ideas" and promotes its ability to "cultivat[e] discussions" and "sharing knowledge."[60]

**d. Joint Ventures**

133. Defendants' interconnected dealings also include at least one joint venture. Nutrien and Mosaic jointly own Defendant Canpotex, a Canadian potash export and marketing company. Canpotex coordinates the offshore marketing, sales, and transportation of potash produced by Nutrien and Mosaic.

134. Defendants' employees display significant overlaps with that of Canpotex. For example, Ken Seitz, Nutrien's current President and CEO served as the former President and CEO of Canpotex from 2015 until 2019. Canpotex's current President and CEO, Gordon McKenzie, spent over fifteen years at Mosaic, including as Mosaic's Vice President-Global Sales.

135. Canpotex operates an export system including railcars, port terminal facilities, and ocean vessels, to transport potash overseas.

136. Canpotex serves as a mechanism through which Nutrien and Mosaic can coordinate various aspects of potash sales, including export volumes and shipping schedules.

137. Canpotex does not export potash into the United States, but it creates opportunities for Nutrien and Mosaic to exchange competitively-sensitive information regarding potash supply and pricing and to align their supply and pricing strategies in the United States.

138. Canpotex produces about 13 million tonnes of potash a year.[61] The U.S. is heavily dependent on imported potash, with imported potash accounting for 93% of U.S. consumption in

---

[60] FIRT, http://firt.org (last visited Mar. 26, 2026).

[61] *Our Markets*, Canpotex, https://www.canpotex.com/what-we-do/our-markets/ (last visited Mar. 26, 2026).

2024.[62] Canada, where Canpotex operates its potash mines, it the most significant source of potash imported into the U.S., accounting for 79% of U.S. potash imports from 2020 to 2023.[63]

139. Because of the U.S.'s heavy reliance on Canadian potash, decisions about the routing, timing, and allocation of Canadian potash exports can influence the overall supply of potash available in the U.S. Consequently, decisions by Canpotex to direct potash tonnage into offshore channels, delay shipments, maintain port inventories, or commit forward volumes abroad would predictably influence the amount of comparable potash available for sale into or affecting the U.S.

**8. Federal Scrutiny and Investigation into Price Collusion in the NPK Fertilizer Industry**

140. On September 26, 2025, the DOJ Antitrust Division and the USDA signed a memorandum of understanding ("MOU") that formalized a partnership between the agencies to protect competition in key agricultural markets.[64] The MOU emphasized the agencies' commitment to "protecting American farmers from the burdens imposed by high and volatile input costs," including fertilizer.[65]

141. On October 28, 2025, Mark Muller, the President of the Iowa Corn Growers Association ("ICGA") testified before the U.S. Senate Committee on the Judiciary regarding the "massive increase in the cost of fertilizer," which he stated was "crushing" corn growers in Iowa

---

[62] *Mineral Commodity Summaries: Potash*, U.S. Geological Survey, https://pubs.usgs.gov/periodicals/mcs2025/mcs2025-potash.pdf (last visited Mar. 26, 2026).

[63] *Id.*

[64] *Justice Department and USDA Coordinate to Protect Competition in Agricultural Inputs*, Dep't of Justice Office of Public Affairs, (Sep. 29, 2025), https://www.justice.gov/opa/pr/ justice-department-and-usda-coordinate-protect-competition-agricultural-inputs.

[65] *Memorandum of Understanding Between The Antitrust Division, Department of Justice and the Department of Agriculture Relative To Cooperation with Respect to Strengthening Competition for Agricultural Inputs* (Sep. 26, 2026), https://www.justice.gov/atr/media/ 1415501/dl?inline.

and nationwide, and called for "rigorous antitrust enforcement."[66] Mueller attributed the rising cost of fertilizers to unchecked consolidation in the NPK Fertilizer market, giving just four main companies dominance in the NPK Fertilizer market: CFI, Koch, Mosaic, and Nutrien.[67]

142. Mueller explained that this dominance has led to fertilizer costs that outpace the price that farmers receive for their corn.[68] For example, the average price over the prior five years to purchase one unit of monoammonium phosphate had been equivalent to approximately 136 bushels of corn. At the time of the hearing, one unit of monoammonium phosphate would cost farmers the equivalent of 230 bushels of corn.[69] As Mueller observed, "even if the price of corn goes up, the price of fertilizer seems to always follow just after. The fertilizer companies just extract any profit from the grower because they can."[70]

143. On December 6, 2025, President Donald Trump issued an executive order identifying anticompetitive behavior as a "threat[] [to] the stability and affordability of America's food supply" and identifying the fertilizer sector as an area with "vulnerabilities to price fixing and other anti-competitive practices."[71] The executive order directed the U.S. Attorney General and

---

[66] Testimony of Mark Mueller President of the Iowa Corn Growers Association, U.S. Senate Committee Judiciary Hearing on Competition Issues in the Seed & Fertilizer Industries, (Oct. 28, 2025), https://www.grassley.senate.gov/imo/media/doc/mark_mueller_testimony_senate_judiciary_committee_submitted_version.pdf.

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Addressing Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain*, Executive Order, (Dec. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/addressing-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/.

the Chairman of the Federal Trade Commission to establish tasks forces to investigate food-related industries for anticompetitive conduct and to take actions necessary to remedy such conduct.[72]

144. The following month, United States Department of Agriculture Deputy Secretary Stephen Vaden delivered remarks to the National Agricultural Law Center, during which he explained that Nutrien and Mosaic constrain the supply of fertilizer, causing farmers to pay supracompetitive prices: "Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay. It's unacceptable."[73]

145. In February 2026, both the ICGA[74] and the Texas Corn Producers Association[75] sent separate letters to U.S. Attorney General Pam Bondi seeking information about the DOJ's efforts to combat anticompetitive conduct in the fertilizer industry.

146. On March 4, 2026, *Bloomberg* reported that the DOJ's Antitrust Division had opened a formal antitrust investigation into the pricing practices of major fertilizer producers to determine whether they colluded or coordinated to raise nitrogen, phosphate and potash fertilizer prices for U.S. farmers, identifying CF Industries, Koch Inc., Mosaic, Nutrien, and Yara

---

[72] *Id.*

[73] *A Conversation with USDA Deputy Secretary Stephen Vaden*, The National Agricultural Law Center, (Jan. 21, 2026), at 46:40-47:19, recording available at https://nationalaglawcenter.org/webinars/vaden/.

[74] Iowa Corn Growers Ass'n, Letter to U.S. Attorney General Pam Bondi (Feb. 5, 2026), https://x.com/iowa_corn/status/2019456648654315988.

[75] Texas Corn Producers Ass'n, Letter to U.S. Attorney General Pam Bondi (Feb. 10, 2026), https://texascorn.org/wp-content/uploads/2026/02/TCPADOJStatusLetter_021026.pdf.

International—the dominant suppliers of NPK Fertilizers—as the companies being investigated.[76] Sources had informed *Bloomberg* that the DOJ's inquiry was examining whether those companies coordinated pricing or supply decisions in violation of the federal antitrust laws.[77]

**9. The NPK Fertilizer Industry Has Drawn Antitrust Scrutiny for Decades**

147. The NPK Fertilizer industry has a decades-long history of antitrust scrutiny. This history shows that the industry has long been susceptible to coordination.

148. In 1993, the DOJ Antitrust Division initiated a criminal investigation into several North American potash producers to examine whether the producers colluded to artificially inflate potash prices.[78]

149. In 2008, U.S. purchasers filed antitrust litigation against major potash producers including Mosaic, PotashCorp, and Agrium, alleging that the producers formed a global cartel that coordinated production and sales to maintain artificially-inflated potash prices by sharing market information, allocating volumes, and restricting output.[79] Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing).[80]

---

[76] *DOJ Probes US Fertilizer Market for Possible Price Fixing*, Josh Sisco and Ilene Peng, (Mar. 4, 2026 at 12:26 p.m.) https://www.bloomberg.com/news/articles/2026-03-04/doj- probes-us-fertilizer-market-for-possible-price-fixing.

[77] *Id.*

[78] *Probe of Potash Price Fixing Ends With No Planned Action*, Wall Street Journal (June 17, 1996). https://www.wsj.com/articles/SB834968145602136000.

[79] *Potash Producers Must Face Buyers' U.S. Antitrust Lawsuit*, Fertilizerworks.com (June 27, 2012), https://www.fertilizerworks.com/news/potash-producers-must-face- buyers%E2%80%99-us-antitrust-lawsuit (discussing *Minn-Chem Inc. v. Agrium Inc.*, No. 101712 (7th Cir. 2008)).

[80] *The Mosaic Company Announces Settlement Of Potash Antitrust Litigation*, PR Newswire (Jan. 30, 2013), https://www.prnewswire.com/news-releases/the-mosaic-company- announces-settlement-of-potash-antitrust-litigation-189020521.html.

150. In 2013, the American Antitrust Institute published a report characterizing the NPK Fertilizer industry as an "oligopoly," concluding that NPK Fertilizer producers likely acted in a coordinated manner to raise fertilizer prices, and calling for antitrust enforcement.[81] The report attributed a 41% overcharge for fertilizer to this anticompetitive, coordinated conduct.[82]

## V. ANTITRUST INJURY

151. Defendants' anticompetitive conduct has the following effects, among others:

a. Competition among Defendants has been restrained or eliminated with respect to NPK Fertilizers;

b. The price of NPK Fertilizers has been fixed, stabilized, or maintained at artificially high levels; and

c. Direct Purchasers of NPK Fertilizers, including Plaintiff and the Class, have been deprived of free and open competition for NPK Fertilizers.

152. During the Class Period, Plaintiff and the Class purchased NPK Fertilizers directly from Defendants. As a result of Defendants' illegal conduct, Plaintiff and the Class were compelled to pay, and did pay, higher prices for NPK Fertilizers than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff and the Class have been injured and suffered damages in the form of overcharges paid on their NPK Fertilizer purchases. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreement is *per se* unlawful, or, alternatively, is unlawful under either a quick look or rule of reason analysis.

---

[81] *The Fertilizer Oligopoly: The case for Global Antitrust Enforcement*, C. Robert Taylor and Diana L. Moss, p. 14 n.20 (Sep. 2013), https://www.antitrustinstitute.org/wp-content/uploads/2013/10/FertilizerMonograph.pdf.

[82] *Id.*

153. NPK Fertilizer prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

## VI. RELEVANT ANTITRUST MARKET

### A. The Relevant Product Market is NPK Fertilizers

154. To the extent a relevant product market needs to be defined in this action, it is the market for NPK Fertilizers.

155. There are no reasonable substitutes for NPK Fertilizers, and they are a distinct product market.

156. Additionally, or in the alternative, individual submarkets exist for nitrogen fertilizers, phosphorus fertilizers, and potash fertilizers.

### B. The Relevant Geographic Market is the United States

157. Should a geographic market need to be defined in this action, it is the United States. Defendants produce and distribute NPK Fertilizers through locations across the United States and have increased NPK Fertilizers prices nationwide.

## VII. INTERSTATE COMMERCE

158. During the Class Period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. All Defendants engaged in illegal activities, as charged herein, that occurred within the flow of, and substantially affected, interstate commerce, and that had a direct and substantial effect upon such commerce.

159. During the Class Period, Defendants manufactured, sold, and shipped NPK Fertilizers in a continuous and uninterrupted flow of interstate commerce, which included sales of NPK Fertilizers into each U.S. state and territory sold to or paid for by Plaintiff and members of

the Class. Defendants' conduct had, and continues to have, a direct, substantial, and reasonably foreseeable effect on interstate commerce.

160. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for NPK Fertilizers in the United States.

161. Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of NPK Fertilizers sold in the United States, the prices of NPK Fertilizers would have been determined by a competitive, efficient market.

## VIII. TOLLING OF THE STATUTE OF LIMITATIONS

162. Plaintiff and members of the Class had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiff and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged until shortly before filing this action.

163. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Class.

164. Defendants' business practices are subject to antitrust laws, and so it was reasonable for Plaintiff and members of the Class to presume that Defendants were operating in a competitive market. A reasonable person under the circumstances would not have had occasion to suspect that Defendants were unlawfully coordinating pricing and supply for NPK Fertilizers until March 4, 2026, when *Bloomberg* revealed that the DOJ was investigating potential collusion in the NPK Fertilizer industry.

165. Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four-year statutes of limitations governing claims under the Sherman Act were tolled at least until March 4, 2026 pursuant to the injury-discovery rule and the doctrine of fraudulent concealment.

166. Further, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. During the Class Period, Defendants continued to make sales of NPK Fertilizers whose prices were fixed as a result of Defendants' collusive conduct.

167. Defendants' overt acts were new and independent acts that perpetuated their collusion and kept them current with market conditions. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and members of the Class.

168. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and members of the Class starts the statutory period running again regardless of Plaintiff' knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of NPK Fertilizer by a Defendant constituted a new cause of action for purposes of the statute of limitations.

## IX. CLASS ACTION ALLEGATIONS

169. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and (b)(3) on behalf of the following Class (the "Class"):

> All persons and entities in the United States and its territories who purchased NPK Fertilizers directly from one or more Defendants, or from any division, subsidiary, predecessor, agent, or affiliate of such Defendants, at any time during the period of January 1, 2021 until Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Class Period").

170. Excluded from the Class are Defendants and their parents, subsidiaries, corporate affiliates; and governmental entities. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserve the right to establish Sub-Classes where appropriate.

171. Members of the Class are so numerous that joinder of all members is impracticable. The precise number of members of the Class and their identities are unknown to Plaintiff at this time. Plaintiff believes that there are at least thousands of members of the Class throughout the United States.

172. Common questions of law and fact exist as to all members of the Class and predominate over any issues solely affecting individual members of the Class. The common and predominating questions of law and fact, each of which may also be certified under Rule 23(c)(4), include, but are not limited to:

a. Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for NPK Fertilizers during the Class Period;

b. Whether Defendants engaged in an agreement, combination, or conspiracy to limit the supply of NPK Fertilizers during the Class Period;

c. Whether such agreements constituted violations of the Sherman Antitrust Act;

d. The identity of the participants of the alleged conspiracy;

e. The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

f. Whether Defendants fraudulently concealed their misconduct;

g. Whether, and to what extent, Defendants' anticompetitive scheme inflated prices of NPK Fertilizers above competitive levels;

h. Whether Defendants' conduct, in whole or in part, caused antitrust injury to the business or property of Plaintiff and members of the Class in the nature of overcharges; and

i. The nature and scope of injunctive relief necessary to restore competition.

173. Plaintiff's claims are typical of the claims of the Class that Plaintiff seeks to represent. As alleged herein, Plaintiff and members of the Class sustained damages arising out of the same unlawful actions and conduct by Defendants.

174. Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or in conflict with the interests of the other the members of the Class.

175. Plaintiff's interests are co-extensive with and are not antagonistic to those of absent members within the Class. Plaintiff will undertake to represent and protect the interests of absent members of the Class and will vigorously prosecute this action.

176. Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex class action litigation, including antitrust litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and the absent members of the Class.

177. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

178. The damages or other financial detriments suffered by individual members of the Class are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the members of the Class, on an individual basis, to obtain effective redress for the wrongs done them. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

179. Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

180. The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class.

181. The interest of members within the Class in individually controlling the prosecution of separate actions is theoretical and not practical. The Class has a high degree of similarity and are cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

182. The nature of notice to the proposed Class is contemplated to be by direct mail upon certification of the Class or, if such notice is not practicable, by the best notice practicable under

the circumstance including, inter alia, email, publication in major newspapers, and/or on the internet.

## X. CLAIMS FOR RELIEF

### Count 1: Price Fixing in Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)

183. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

184. Beginning at a time currently unknown to Plaintiff, but at least as early as January, 1, 2021, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regard to NPK Fertilizers in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

185. The contract, combination, or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for NPK Fertilizers in the United States and its territories.

186. In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including the following:

a. Exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of NPK Fertilizers sold in the United States and its territories;

b. Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of NPK Fertilizers, including surcharges on NPK Fertilizers sold in the United States and its territories; and

c. Participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

187. Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of NPK Fertilizers.

188. Defendants' conspiracy had the following effects, among others:

a. Price competition in the market for NPK Fertilizers has been restrained, suppressed, and/or eliminated;

b. Prices for NPK Fertilizers provided by Defendants have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

c. Plaintiff and members of the Class who purchased NPK Fertilizers from Defendants have been deprived of the benefits of free and open competition.

189. Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for NPK Fertilizers purchased from Defendants than they would have paid and will pay in the absence of the conspiracy.

190. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

191. Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged.

## XI. DEMAND FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully demands that this Court:

a. Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and appoint Plaintiff as the named representative of the Class;

b. Award Plaintiff and the Class damages (including, to the extent applicable, treble damages) in an amount to be determined at trial, plus interest in accordance with law;

c. Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

d. Award a declaratory judgment that Defendants' price fixing for NPK Fertilizer was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the U.S. market for NPK Fertilizer in violation of the Sherman Act, § 1;

e. Grant permanent injunctive relief:

    i. enjoining Defendants from engaging in future anticompetitive conduct with the purpose or effect of preventing actual or potential rivals from gaining a foothold in the NPK Fertilizer market and eliminating or impairing the price discipline that would come from free and fair competition; and

    ii. requiring Defendants to take affirmative steps to dissipate the continuing effects of its prior unlawful conduct;

f. Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

g. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XII. DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: April 9, 2026

Respectfully submitted,

By: s/ *Tyler W. Hudson*
Thomas P. Carmell (KS #17020)
Tyler W. Hudson (KS #20293)
Eric D. Barton (KS #16503)
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: (816)701-1100
Fax: (816) 531-2372
tcartmell@wcllp.com
thudson@wcllp.com
ebarton@wcllp.com

-and-

Joseph H. Meltzer (*pro hac vice* forthcoming)
Terence S. Ziegler (*pro hac vice* forthcoming)
Melissa L. Yeates (*pro hac vice* forthcoming)
Daniel S. Dicce (*pro hac vice* forthcoming)
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
jmeltzer@ktmc.com
tziegler@ktmc.com
myeates@ktmc.com
ddicce@ktmc.com

-and-

James E. Cecchi (*pro hac vice* forthcoming)
Zachary A. Jacobs (*pro hac vice* forthcoming)
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
T:(973) 994-1700
F: (973) 994-1744
jcecchi@carellabyrne.com
zjacobs@carellabyrne.com

-and-

Amy C. Martin (*pro hac vice* forthcoming)
**MARTIN LAW GROUP PLLC**
1250 Connecticut Ave. NW, Suite 700
Washington D.C. 20036
Tel: (202) 261-3563
amy@martinlawgroupllc.com

*Counsel for Plaintiff Long Branch Farms LLC and the Proposed Class*